## SUPREME COURT.

JOHN W. THOMPSON and WILLIAM A. WAIT, agt. THE ERIE
RAILWAY COMPANY and THE FARMERS' LOAN AND TRUST
COMPANY.

The statute gives every *railroad corporation* the power to borrow money for com-
pleting, furnishing, and operating its road, to issue bonds for any amount so bor-
rowed, and to mortgage its property and franchises to secure such bonds, or for
any debt contracted for the purposes aforementioned.

Where such a corporation have issued a mortgage in trust " to consolidate its
funded debt, obtain the money and material necessary for perfecting its line of
railway, enlarging its capacities, and extending the facilities thereof," they have
the power to issue their *bonds* for the amount and for the purposes expressed in
the mortgage.

If they have the power to make such mortgage and issue bonds thereon, no suit to
restrain such action will lie by a common stockholder, or by *preferred stockholders*,
who stand in no better condition.

And especially where there is no evidence in the case showing that the plaintiffs
would sustain injury by the acts sought to be restrained.

*Warren Circuit, Sept.,* 1871.

THIS action, as originally commenced, included as defend-
ants the directors of the Erie Railway Company.

Before proceeding to trial the plaintiffs discontinued as to
such persons, and amended their complaint, limiting its alle-
gations to the two defendants above named.

Said defendants, at the same time, amended their answer,
and the case proceeded to trial on pleadings and proofs.

From the pleadings and evidence it appeared, that prior to
1859, a corporation known as the New York and Erie Rail-
road Company, owned and operated a railroad from Jersey
City to Lake Erie ; that it had mortgaged its property and
franchises under five several mortgages; had outstanding
against it judgments and contract liabilities amounting to

over $28,500,000; had suffered default in the payment of interest on its mortgage bonds, whereby, by the terms of said mortgages, the whole of the principal of said bonds issued had become due, and the said corporation thereby greatly embarrassed.

During the year 1859, a receiver was appointed in a foreclosure suit on one of said mortgages, who took actual possession of said road. While matters were in this condition the parties interested in the said corporation and its property, to wit, its officers, stockholders, and creditors, entered into an arrangement for a new railroad, one of the conditions of which was, that the unsecured creditors of the old company should receive, in payment of their claims, stock in the new company, the interest on which should have preference in payment of interest over dividends on the common stock, out of the net earnings in each year, after the payment of the mortgage interest of said company.

That proper legislation for that purpose having been had, in 1861 the said Erie Railway Company was organized upon the basis and conditions thus agreed, and the said company issued to the said unsecured creditors of the old corporation stock above described, and known as "preferred stock," which was accepted by them as payment.

The plaintiffs are severally holders of certain shares of this preferred stock.

Under the arrangement for organizing the new company, the existing mortgages on the property and franchise of the old company were continued and their payment assumed by said new company, that the first of said mortgages would become due 1879, but has since been extended twenty years. That the other mortgages will become due at intervals between 1879 and 1888; that since said arrangement, nearly one million dollars of the bonds secured by said previous mortgages has been paid; that the value of the property and franchise of the Erie Railway Company exceed in value the amount of the mortgage debt which existed against the road

at its present organization, and also the present outstanding mortgage debt; that the fact that the said outstanding mortgage debt against the old company was distributed so as to become due, and payable at different periods, formed a material part of the inducement and consideration for the arrangement which resulted in the organization of the new company.

The Erie Railway Company had, previous to the commencement of this action, made and executed a mortgage upon its property and franchises, its tolls and income, to the Farmers' Loan and Trust Company, in trust, to secure the payment of thirty thousand bonds of one thousand dollars each, payable in gold fifty years from date, with interest payable semi-annually, in which said mortgage it is provided, in case of default for six months of the payment of interest on the bonds issued, the whole principal of such issue shall become due; that said mortgage has been recorded in the several County Clerk's offices along the line of the road, and remains of record.

That it appears from said mortgage, that the same was made for the purpose of consolidating the funded debt of said corporation and obtaining money and material necessary for completing its line of railway, enlarging its capacity and extending its facilities; that said railroad company is threatening to issue bonds, secured by said mortgage, in due form of law, to the number named in said mortgage, and put the same upon the market.

That each of the existing mortgages against the old railroad company contained a clause providing, " that if default should be made in the payment of interest, and so continue for six months, the whole principal should then become due and demandable."

That at about the time the new mortgage mentioned was made, the said Erie Railway Company were owing a floating debt of about $6,000,000, and on sterling bonds about $1,-000,000, due in 1875,   That bonds to about $6,000,000,

under said last mortgage, were made and signed, but not delivered, before the commencement of this action.

The plaintiffs ask to have the said new mortgage removed from the records, and the several bonds made under it, together with the mortgage cancelled. That said Erie Railway, its officers, &c., be forever restrained from executing or delivering, &c., any bonds under or secured by said new mortgage, and that the Farmers' Loan and Trust Company be also forever restrained, &c., from certifying, selling, &c., any bonds or obligations under, or purporting to be made under, or secured by said mortgage.

FRANK THOMPSON *and* JAS. EMOTT, *for plaintiffs.*

I. The proposed mortgage is not within the borrowing powers conferred on the defendant by the state.

*First.* The right to borrow money is given and regulated by the tenth subdivision of the 28th section of the general railroad law, in these words :

Such corporation shall have power " from time to time to borrow such sums of money as may be necessary for completing and finishing or operating their railroad, and to issue and dispose of their bonds for any amount so borrowed, and to mortgage their corporate property and franchises, to secure the payment of any debt contracted by the company for the purposes aforesaid, &c. (*L. L.* 1850, *Chap.* 140, § 28, *sub.* 10).

The power, if it exist, must be found in this statute.

It is a necessary deduction from the very nature of a corporation as an artificial being, that its powers must be derived from its charter or the general law under which it is organized.

"It is quite clear, that a railroad corporation has no power to mortgage its franchises without the consent of the legislature, and it is very questionable whether it has power to mortgage its road or rolling stock without such consent

(*Bement* agt. *Plattsburgh and Montreal R. R.*, 47 *Barb.*, 104, 114).

The same principle is affirmed in *Winch* agt. *Railway Co.*, 13 *E. L. and E.*, 506; *S. Y. R. Co.* agt. *Great N. R. Co.*, 19 *E. L. and E.*, 513; *Troy and Rutland R. R. Co.* agt. *Kerr*, 17 *Barb.*, 581; *State* agt. *Rivers*, 5 *Iredell*, 297.

The same principl e is reiterated in the Revised Statutes *R. S. Part* 1, *Chap.* xviii. *Title* iii, (1 *R. S.*, 600, § 3.)

" Section 3. In addition to the powers enumerated in the 1st section of this title, and to those expressly given in its charter, or in the act under which it is or shall be incorporated, *no corporation shall possess or exercise any corporate powers* except such as shall be necessary to the exercise of the powers so enumerated or given."

*Second.* The proposed mortgage is avowed on its face to be issued (1st), to consolidate the funded debt, and (2d), "for the purpose of obtaining the money and material necessary for perfecting its line of railway, and enlarging the capacities and extending the facilities thereof."

These are purposes not enumerated in the statute, and for which the defendant has not the power under the statute to create a mortgage lien on its property.

*Third. In fact,* such mortgage is executed for a purpose neither expressed in it, nor authorized by the statute.

It is *actually* given in order to raise money to pay off a "floating debt," which floating debt has not been incurred for the purposes expressed in the mortgage.

The defendants' witness Smith, did not pretend that such indebtedness had been incurred for those purposes.

His evidence shows that such floating indebtedness existed at the time the mortgage was executed—the expressed purpose of the mortgage is to consolidate the funded debt, and to raise money for the *future* perfecting the facilities of a railway which has been operated for over twenty years. Floating debt to the amount mentioned (if the railway were properly managed) could be paid off every

year.   The N. Y. Cent. & H. R. R. Company annually pays over $7,200,000, as dividends, besides interest on its mortgage debt.

II.  But if the power to mortgage for the purposes expressed in this instrument does exist, it is vested in the stockholders at large.

The section cited vests that power in the " corporation," *i. e.*, the stockholders.    This section very carefully distinguishes what powers are vested in the directors, and what in the corporation at large.

In regard to the issue of bonds which is governed by the same section, the *Directors* are authorized to make such bonds convertible into stock, but the *Corporation* is vested with the power to mortgage.

The stockholders have never by by-law delegated this power to the board.

The directors have authority only to perform the *ordinary* business of the company, *i. e.*, the *operating* their railway.

In a similar case in Vermont, where a *corporation* was authorized to sell and convey its property, it was held, that there must be a *corporate vote* authorizing the transfer (*Isham* agt. *Bennington Iron Works*, 19 *Vermt.*, 230).

III. If the defendant has authority to mortgage its corporate property and franchises, it has by no means the power to execute the anomalous instrument, here *called* a mortgage, containing the extraordinary provisions and stipulations therein set forth.

*First.* Such instrument, though in form a mortgage is in legal effect an absolute grant.

It bears date, September 1, 1870.   It provides, that in case of default for six months in the payment of any installment of the semi-annual interest—the whole principal shall become due, and the trustee shall thereupon, at once enter into possession of, and operate the road.

*Second.* The trustee's disposition of the earnings is provided

for, and, that in a manner in express derogation of the plaintiff's rights.

The trustee—is first to pay all current expenses, including, of course, the rent of *all* leased roads, then the interest on the entire funded debt, as well as on that created subsequently to the preferred stock as on that existing when our contract was made.

By Judge INGRAHAM'S decision on the demurrer in the Peck suit, it was expressly held, that the preferred stock should have precedence (in the payment of interest) to the subsequent mortgages and leases.

*Third.* Every guarantee of good faith, or fair dealing on the part of the trustee is waived.

Such trustee is to be held accountable only for *gross negligence.*

If this were the sole objection presented, it would be fatal to the proposed mortgage.

*Fourth.* The ordinary and essential formalities of foreclosure and sale are entirely done away with.

IV. We have considered the defendant's power to mortgage entirely irrespective of its limitation by reason of the prior contract made with the preferred stockholders.

By the contract with the preferred stockholders, they became creditors of the defendant, and have an equitable lien next after the mortgage debt existing at the time of making that contract. Such mortgage debt amounts to about $18,-554,000, and by the decisions of the highest tribunal, is payable *in lawful money.*

This equitable lien is to be cut off, and postponed to a mortgage debt of $30,000,000 in *gold coin,* (equal to over $34,200,000), and the bonds under such mortgage are to be sold to the public at large, without notice of plaintiffs' rights.

The negotiation of such bonds would create a cloud upon the prior title of the preferred stockholders, a complete exhaustion of the annual earnings by the payment of the increased interest on the funded debt, and in case of foreclo-

sure or the taking possession by the trustee, a complete annihilation of the preferred stock.

*First.* The *status* of the plaintiff is fully established by the authorities and the decisions of this court and the court of last resort.

The preliminary arrangement known as the amicable agreement, and the creation and issue of the preferred stock under the legislative authority to carry out that agreement, constitute a *contract* between the parties, and must be applied to and construed with reference to the objects contemplated by the contracting parties.

The holders of the sinking fund bonds and judgment creditors were to be paid seven per cent. per annum on the amount of their claims or investments next after the payment of the interest on the then mortgaged debt.

The *status* of the preferred stockholders (so-called) under this contract corresponds precisely to that of the debenture stockholder under the English system, except that their priority, as against subsequent incumbrancers, in good faith, is not in terms protected by the statute.

(*a*). See the statute governing the creation and issue of debenture stock (*Companies Clauses Act,* 1863, 26 *and* 27 *Victoria, chap.* 118, §§ 22–35, *Shelford on Railways, II.,* *pp.* 206, &c.)

Section 24 of that act is as follows:

§ 24. The interest on debenture stock shall have priority of payment over all dividends or interest on any shares or stock of the company, whether ordinary, or preference, or guaranteed, and shall rank next to the interest, payable on the mortgages or bonds, for the time being, of the company, legally granted before the creation of such stock; but the holders of debenture stock shall not, as among themselves, be entitled to any preference or priority.

(*b*). The American decisions fully sustain this doctrine (*Bates* agt. *Androscoggin, &c., R. R., Co.,* 49 *Maine,* 491).

Here certificates of stock, in the usual form, were issued

to the  plaintiff, and  on the  back  of the  certificate was  indorsed  as follows: " Preferred  stock.    This certificate is for preferred  stock,  created  July  10th,  1849, and  entitles  the holder, from  the net earnings  of  the road, to the  payment of six dollars per share, semi-annually, until the net earnings of the road shall be sufficient  to  pay  an  interest  of  six per cent. per  annum  on  all  the  stock  issued  and  all the bonds issued for the first and second loans."

The  plaintiffs  sued in  debt for  ten semi-annual  dividends or installments of interest.

The defendant objected that " the holders of this preferred stock  are not creditors of the corporation.   They are merely stockholders.    They have a preferred claim to the dividends, but  they  have  no  claim  unless  there  are dividends.    There cannot legally  be  a dividend until  there  are profits and the floating  debts are  paid.    The  net  earnings  belong  to  the creditors  and not  to  the  stockholders, whether  preferred or not."

*Held,* " That  the words *semi-annual  dividends*  were not used in a tenchnical sense, but were intended to mean nothing different from *semi-annual payments,* which payments depended *upon  no  contingency, except  that  the net earnings  of  the road, after  paying  interest  to  the  bondholders, should  be  sufficient to  meet  this  obligation.*"

" The  action, as  we have  already  seen, is  not  upon  the stock *per  se,* nor technically  for dividends declared upon the stock of the  company, but  upon  a  contract, by which  the defendants  obligated themselves to pay certain specified sums at  certain times in  consideration  that the  plaintiff  had taken stock  of  the  company " (*McLaughlin* agt. *Detroit  & Milwaukie R. R. Co.,* 8 *Mich.,* 100.

A  certificate was  issued by  a corporation in  the  ordinary form  of  certificates of  stock, but  containing a promise on the part  of  the corporation to pay interest  thereon until the happening  of  a specific event.

By a resolution of the *stockholders,* it was resolved to issue

to the holders of such certificates special interest bonds for the amount of interest accrued and past due on their stock.

The plaintiff refused to take the special interest bond for the amount of interest due on his certificate, and sued for the amount in cash.

The defendant contended that plaintiff, being a stockholder, was bound by the resolution.

The court held that "the stipulation in the certificate for the payment of interest constituted a contract between the company and the plaintiff as an individual; it created the relation of debtor and creditor to the extent of the semi-annual interest. The company could no more change, affect, or modify his rights or their liability under this contract by a resolution or by-law without his individual consent than they could in the same way affect their contract with or liability to a stranger" (*Redfield on Railways*, 4th ed., II., 516.)

"Preferred stock is only a form of mortgage" (*See also March* agt. *Eastern R. R. Co.*, 43 N. H., 515).

(c). The decision of Justice INGRAHAM in the Peck suit establishes precisely our *status*.

It was there decided that our rights *as against the defendant* are precisely those of the debenture stockholder under the English system.

(d). The decision of the Court of Appeals in the case last referred to expressly negatives and disposes of the theory of the defendant, that our preference is simply to a dividend in *case the defendant's directors see fit to declare one.*

(e). The defendant went into possession of the property and franchises, which it now holds under a *trust agreement* in favor of the preferred stockholders, and it cannot alter or modify that agreement, much less destroy it, without the consent of such preferred stockholders.

This doctrine was affirmed at general term, and adopted by the court of appeals, so far as the question was there considered.

(f.) The English and Irish cases in preference shares sustains

this doctrine. (See *Henry* agt. *Great Northern Railway Co.,* 27, *Law Jr.*, 1-16; *S. C.,* 4 *Kay & Johns.,* 1-21; *Crawford* agt. *North Eastern Railway Co.,* 3 *Kay & Johns.*, 741; *Matthews* agt. *Great Northern Railway Co.,* 28 *Law Jr.,* 375; *Smith* agt. *Cork & Bandon Railway Co.;* 3 *Irish* (*Eq.*) *N. S.,* 356; *Sturge* agt. *Eastern Union Railway Co.,* 7 *De G. Macn. & Gord,* 158; *S. C.,* 31 *E. L., & E.*, 406; *Stevens* agt. *South Devon Railway Co.,* 9 *Hare,* 313; *S. C.* 13 *Beavan,* 48).

*Second.* The new proposed bonds are negotiable securities, and a *bona fide* purchaser for value without notice of plaintiff's equities, may enforce them against the company and its property and franchises in full, irrespective of any equities in favor of the plaintiffs (*White* agt. *Vermont, &c., R. Co.,* 21 *How., U. S.,* 575; *Morris Canal, &c., Co.* agt. *Fisher,* 1 *Stockton Ch.,* 667, (9 *N. J. Eq.*) ; 1 *Beasley,* 323, (12 *N. J., Ch.*) ; *so held by the unanimous vote of the court of last resort ; Chapin* agt. *Vermont, &c., R. Co.,* 8 *Gray,* 575 ; *Conn. Mut. Ins. Co.* agt. *C. C., &c., Ry. Co.,* 41 *Barb.,* 9 ; *Mech. Bk.* agt. *N. Y., and N. H. R. R. Co.,* 3 *Kern.,* 599; 625 ; *Brainerd* agt. *N. Y. & Harlem Ry. Co.,* 25 *N. Y.,* 496 ; *Curtis* agt. *Leavitt,* 15 *N. Y.,* 9, 174, 258; *Eaton & Hamilton Ry. Co.* agt. *Hunt,* 20 *Ind.,* 457 ; *and many cases cited in above reports*).

*Third.* The holders or purchasers of these bonds would have no notice of any rights, equities or claims of the preferred stockholders.

The proposed bonds are to be all of the same tenor—all secured by the same mortgage and only discriminated by the numbers.

All that is proposed in respect to the numbers of the bonds is, that so many bonds shall be used to pay the funded and floating debt incurred subsequent to the issue of the preferred stock.

(*a.*) This amounts to nothing. Of course, this number of bonds will be used for these purposes, and the bonds will be

numbered; but it is not even provided that the bonds thus used should be consecutive numbers. So that the mortgage does not require or provide even for the slight indication by numbers of the use of the bonds issued.

(*b.*) The imprint of a number on a bond would be no notice to a purchaser of the object for which it was issued or the equities to which it was subject.

(*c.*) It would be impossible upon a foreclosure and sale under such a mortgage to protect the rights of the preferred stockholders—holders of an equitable mortgage of the earnings, intermediate the two portions of debt consolidated in the mortgage.

*Fourth.* The proposition is too clear for discussion, that the proposed bonds if negotiated to *bona fide* purchasers, whether properly and lawfully executed or not, would be a *cloud on plaintiff's title*, and utterly destructive of their rights.

(*a.*) *Until foreclosure*, the interest in *gold* on $30,000,000, instead of interest *in lawful money* on $18,554,000, is to be paid *annually* from the earnings, before plaintiff's dividends are paid.

(*b.*) *Upon foreclosure*, in order to redeem, $34,200,000, prior lien indebtedness is to be paid, instead of $18,554,000. The former sum being equivalent in lawful money to the principal of such mortgage at the present price of gold.

V. Even if such were not the case, and the portion of the new mortgage debt representing the old mortgage liens could be distinguished (which is not the case), and even if the *bona fide* purchaser of the new bonds acquired no superior equities, the prior lien debt *would be increased* under the new mortgage several millions of dollars, and that amount of liability superadded to the present prior mortgage lien.

The $18,554,000 is payable *in lawful money of the United States (Recent decisions of the U. S. Supreme Court).*

It is proposed to issue bonds of an equal face value payable in *gold coin.*

At the present price of gold (114 per centum) this would exaggerate the prior lien debt, $2,597,560.

This enormous sum is to be presented as *an absolute gift* to the prior mortgage bondholders without one cent of consideration, or one particle of benefit moving from them.

This sum, or such other sum as might represent the gold premium at the time of foreclosure, would have to be paid in case of a foreclosure (even if the prior lien debt were distinguishable) in addition to the agreed amount thereof, before the preferred stockholders could redeem.

The annual interest charge on the prior debt (being payable in gold coin by the terms of the new mortgage) would, by a like computation, be increased by over $180,000.

This annual gift is without one cent of consideration or benefit moving from the prior lien bondholders.

All accrued interest (which would necessarily be for the period of at least a year and probably more) would be superadded to the principal amount to be paid by the preferred stockholders, in case of foreclosure.

VI. The defendant should be compelled to separate these two classes of debt into two distinct mortgages, and not permitted to confound the claims of creditors, whose rights are distinct and widely different, or to destroy or impair our rights by such a confusion.

VII. The result of this disastrous and ruinous financial operation in respect of the liability thereby to be saddled upon this defendant, and its property may be summed up thus:

*Present liability of the company on funded debt and the annual interest charge, on such debt are as follows :*

| | |
|---|---:|
| Present mortgage debt payable in lawful money . | $18,554,000 |
| Sterling loan, £1,000,000, $5,000,000 gold, at 114 per cent. premium, is equal to........ | 5,700,000 |
| Total principal of funded debt............... | $24,254,000 |

| | |
|---|---:|
| Interest each year on mortgage debt, at 7 per cent., the stipulated rate...................... | $1,298,780 |
| Interest on sterling loan, 6 per cent. gold equals $300,000. This sum is equal to (lawful money)..................................................... | 342,000 |
| Total annual interest on funded debt.......... | $1,640,780 |

*Liability under proposed mortgage if consummated :*

| | |
|---|---:|
| Principal $30,000.000 gold equal to, (lawful money) ........................................ | $34,200,000 |
| Annual interest charge, interest on consolidated mortgage, 7 per cent. in gold, $2,100,000 equal to................................... | $2,394,000 |

The new mortgage, therefore, increases the liability of the company, as to principal:

| | |
|---|---:|
| Under new mortgage........................... | $34,200,000 |
| Present ....................................... | 24,254,000 |
| Increase principal funded debt................ | 9,946,000 |
| Present annual interest............ $1,640,780 | |
| Annual interest under new mortgage........................ 2,394,000 | |
| Increase annual interest............ $ 753,220 | |

This increase for fifty years the term of the mortgage is..............................

| | |
|---|---:|
| mortgage is.............................. | $37,661,000 |
| Total increase of liability under new mortgage. | 47,607,000 |

The new mortgage it is claimed, will realize by the sale of the $6,000,000 bonds to be sold at 80 per cent................................

| | |
|---|---:|
| 80 per cent................................ | 4,800,000 |

Net increase of liability by reason of the new mortgage..................................

| | |
|---|---:|
| mortgage.................................. | $42,807,000 |

In addition to this the sterling bondholders are to be gratuitously provided with a mortgage lien on the entire property and franchises of the defendant, they being now simple contract creditors.

The manifest advantage in having the mortgage debt become due in comparatively small sums at considerable intervals, rendering it easy to liquidate, extend, or modify as to the terms of payment, is to be entirely thrown away.

This enormous liability is to be irretrievably saddled upon the property and franchises of this defendant, (in addition to the fifty or sixty millions of liability already incurred by the defendants' managers, by way of increase of capital stock), in order to raise a sum which with fair management would be netted from the defendant's business in four or five months.

And this is to be done though the defendant has full power (already exercised to the amount above mentioned) to raise moneys by convertible bonds, creating no lien on the corporate property or franchises, by the very section of the statute under which the power to mortgage is claimed.

THOS. G. SHEARMAN, DAVID DUDLEY FIELD, and WM. A. BEACH, *for defendants.*

I. The complaint must clearly be dismissed as against the Farmers' Loan and Trust Company. The answer of that company did not admit that the plaintiffs were holders of any stock whatever in the company, nor that there was any such stock as the preferred stock described in the complaint; and as no proof was given by the plaintiffs upon these points, it is obvious that the action must instantly fall to the ground, so far as it concerns this defendant. The objection was raised immediately upon the close of the plaintiffs' case, and full opportunity was given them to obviate the difficulty, but they did not do so.

II. So far as the action concerns the Erie Railway Com-

pany, it was conceded by the plaintiffs that the mortgage was a just and proper one with reference to the interest of its common stockholders, and the only grounds of objection to it are (1), that it consolidates the old bonds falling due at various periods, none of them later than the year 1888, with new bonds to fall due in the year 1920, thus, as it is said, confusing the bonds which have a prior right over the plaintiffs with bonds which have only rights inferior to those of the plaintiffs, and (2), that the mortgage contains an interest clause by virtue of which, upon a default in the payment of interest, the whole principal of the bonds may become due in six months. It was conceded that if the holders of preferred stock were mere stockholders, this action could not be maintained, that it was insisted that they held the treble position of stockholders, creditors, and beneficiaries of a trust, the company being their trustee. These propositions will be considered separately, and we shall further take occasion to show that, even if they were all conceded, this action has not a shadow of foundation.

III. The Erie Railway Company is not a trustee for its preferred stockholders.

1. Those stockholders are part of the constituent elements of the company itself, and nothing is clearer in principle than that a corporation is not, and cannot be a trustee for its own stockholders as such, any more than an individual can be trustee for himself (*Angel & Ames on Corp.* § 313; *Verplanck* agt. *Mercantile Ins. Co.*, 1 *Edw. Ch.*, 84; *Hodges* agt. *New England Screw Co.*, 1 *R. I.*, 312.

2. If it could be successfully claimed that the Erie Railway Company was trustee for its preferred stockholders, it would be just as well claimed that it was a trustee for each of its other stockholders separately, because the only foundation of the claim lies in the fact that the company derives its title through purchase made by Messrs. Davis & Gregory, who were trustees not merely for the unsecured creditors of the old corporation, to whom the preferred stockholders

claim to be successors, but also for the common stockholders of the old corporation, who were permitted to become stockholders in the new company upon the payment of a small assessment. The result of all this would be that the Erie Railway Company could do nothing to which a single stockholder should object as diminishing his profits, and thus nine-tenths of the stockholders would be thwarted and their will nullified by the perverse objections of the remaining tenth.

3. But, in fact, the trust of Messrs. Davis and Gregory was entirely discharged by the organization of the Erie Railway Company. They were not made trustees for the purpose of holding the property forever, either in their own names or in the name of any other trustee, but simply for the purpose of purchasing the property sold under the foreclosure of mortgage, holding it until the unsecured creditors and stockholders of the old corporation could have time to organize a new corporation and take possession of the property. This trust was fully discharged, and the property transferred to the beneficiaries of the trust. Messrs. Davis and Gregory retained no share in it, except such as they were entitled to by virtue of their claims as unsecured creditors or stockholders of the old corporation; and neither they nor the other corporators associated with them took or could take an interest to the extent of one dollar in the Erie Railway Company, or its property, beyond what they were entitled to as beneficiaries of the trust, and not as trustees.

4. The plaintiffs in this case are not, and never were, beneficiaries of the trust held by Messrs. Davis and Gregory. They never were either creditors or stockholders of the New York and Erie Railroad Company, the only parties in whose favor a trust was ever created. Neither do they pretend to have received an assignment of the rights, if any, which the unsecured creditors of the old corporation had against Messrs. Davis and Gregory. Even, therefore, if the persons to whom the preferred stock was originally issued in exchange for their

surrender of unsecured debts could insist that they retained, notwithstanding this surrender, any rights as beneficiaries of a trust, these rights do not attach themselves to the preferred stock held by them, but would require a separate assignment, which the plaintiffs do not pretend has been made to them.

IV. The plaintiffs and the preferred stockholders of the Erie Railway Company are not its creditors in any sense.

1. It is admitted that they are not creditors for the principal of the amount represented by their stock, and the only claim made is, that they are creditors to the extent of the annual dividend to be paid to them. As to this it is sufficient to say :

(a.) It does not anywhere appear in the pleadings or evidence, that these dividends have not been regularly and fully paid.

(b.) It is admitted, that these dividends are not due to them unless the company has net earnings sufficient to pay them, which is, of course, a matter of entire uncertainty, and there is, therefore, on the plaintiffs' own showing, no present debt due to them, and no certainty that anything will be due to them in the future. Is it not a most amazing perversion of language to call such persons creditors ?

2. The preferred stockholders never were or could be creditors of the Erie Railway Company. They formed a part of its first constituent elements. It was impossible that it should owe them anything, when the company itself had no existence until this stock was created, and when it did not assume the debts of any other person or corporation (*Verplanck* agt. *Mercantile Ins. Co.*, 1 *Edw. Ch.*, 84).

3. The original holders of this preferred stock were creditors of the *New York and Erie Railroad Company*, a corporation perfectly distinct from the defendant herein; and they, of their own free will, chose to become stockholders in the new corporation rather than to remain creditors of the old, in the well founded belief that the new company, freed from the embarrassments of the old, would be able to do more

for them as mere stockholders than the old company could have done for them if they had continued to be creditors. If it had been contemplated that they would be creditors of the new corporation as well as of the old, the whole object of the scheme, upon which the new company was formed, would have been nullified, and the complicated machinery by which the new corporation was formed, would have been a monstrous absurdity.

4. But *these plaintiffs* never were creditors even of the old corporation. If the claims of such creditors are in existence at all, they still belong to the *original* holders of the preferred stock, a transfer of the stock not being sufficient to carry with it an assignment of the claims which the original holders of such stock might have had against the old corporation. The complaint does not pretend that any such assignment was made to the plaintiffs, and none such was made in fact. It will be seen by reference to the complaint, that these two plaintiffs purchased their stock at a comparatively recent period, and were far from being the original holders of the stock.

5. It is an impossibility that the ownership of stock in a corporation, should make any one a creditor of the corporation. As well might it be said, that a man owed money to himself, or owned his own promissory note, a claim justly exploded on the first occasion that it was set up (*Schermerhorn* agt. *Talman*, 14 *N. Y.*, 93, 117).

6. It has been expressly adjudged, that holders of preferred stock, are *not* creditors of the corporation. This was held, even where dividends were *guaranteed* on the preferred stock, which presented a much stronger case against the company than exists here (*Williston* agt. *Michigan Southern R. R. Co.*, 13 *Allen*, 400 ; *Taft* agt. *Hartford, Fishkill R. R. Co.*, 8 *R. I.*, 310).

V. But even if, we were to concede that the preferred stockholders are, as it is claimed, mortgagees of the net earnings of the Erie Railway or beneficiaries of a trust in such

earnings, the plaintiffs would, nevertheless, have no cause of action.

1. It is well settled that a creditor, not having pursued his claim to judgment, cannot bring an action to restrain his debtor from any disposition of his property whatever, even though such disposition be fraudulent (*Reubens* agt. *Joel*, 13 *N. Y.*, 488 ; *Mills* agt. *Northern Railway Co.*, *Law Rep.*, 5 *Ch.* 621).

2. If the preferred stockholders have a mortgage upon the net earnings, that mortgage was created by the charter of 1860, and all persons dealing with the company must take notice of that charter, so that no subsequent mortgages could possibly gain a lien prior to that of the preferred stockholders, and if the railway were mortgaged to forty times its value, or sold twenty times in succession, neither the mortgagees nor the purchasers could dispute the right of the preferred stockholders to the regular payment of their dividends out of the net earnings.

3. If the Erie Railway Company is a trustee of the preferred stockholders, then that trust being created by public statute, namely, the charter of 1860, all persons are bound to take notice of that, and no one, whether by mortgage or purchase, can acquire a title to, or lien upon, the railway, free from that trust, but every mortgagee or purchaser must take the property subject to the trust (*Day* agt. *Roth*, 18 *N. Y.*, 488).

4. Neither is there the least force in the objection that the bonds under the prior mortgages will be mixed and confounded with the new bonds.

(*a*) This objection is not set forth nor hinted at in the complaint. It is not alleged as a matter of fact that no discrimination will be made between these bonds, or that it will be impracticable to trace them out. If such were the case it was incumbent upon the plaintiffs to prove it, and they have neither alleged nor proved it. It is a mere guess or surmise unsupported by evidence.

(*b*) It is obvious in the nature of things that the records of the two corporations must show which particular bonds were exchanged for bonds under the prior mortgages, and which were sold for cash.

(*c*) But if this were not so, the only result would be to place the preferred stockholders in a better position than that which they now occupy. Every holder of a prior mortgage bond, who exchanged it for a bond under the new mortgage, would necessarily waive the priority which he now has over the preferred stock, and would come in as a subsequent mortgagee whose rights were necessarily inferior to the rights of the preferred stockholders, if, as the plaintiffs insist, they are mortgagees or beneficiaries of a trust. The result of the proposed exchange of bonds, therefore, assuming the plaintiff's theory, and the *obiter dicta* of Judge ROSEKRANS on which they rely, to be correct, would be to make the dividends on preferred stock a first lien upon the net earnings, superior to the claims of the entire mortgage debt of the company. Even if it were possible to conceive that the holders of bonds bearing seven per cent. interest in currency, secured by the earlier mortgages, could exchange them for bonds bearing seven per cent. interest in gold under the new mortgage, and yet retain their right to be secured by the old mortgages, which is a palpable absurdity, yet the argument of the plaintiffs, conceding that they can only be injured by such a confusion of the bonds as shall make it impossible to tell which were issued in exchange for old mortgage bonds, and which for cash, is fatal to any inference that might be drawn for their benefit from even this supposition, since it is obvious that in case of such confusion no holder of a bond under the new mortgage could identify his interest under the old mortgages.

(*d*) Nothing is better settled than that a mortgage once satisfied cannot be kept on foot to the prejudice of an intervening incumbrancer; and this, even though the payer of the

mortgage took a new mortgage, *eo instanti*, to secure him-
self (*Banta* agt. *Garmo*, 1 *Sandf. Ch.* 383; *Marvin* agt.
*Vedder*, 5 *Cow.*, 671; *Mead* agt. *York*, 6 *N. Y.*, 449;
*Truscott* agt. *King*, 6 *N. Y.*, 147).

5. Indeed the whole of the plaintiffs' claim in this respect
is too transparent for discussion. The argument of the
plaintiff's counsel was suicidal. It consisted of a series of
propositions, every one of which contradicted all the rest.
Thus, almost the entire argument for the plaintiffs consisted
of these propositions: (1) that the preferred stockholders
were mortgagees; (2) that the company had no power to
make any mortgage which should prejudice the rights of the
preferred stockholders; (3) that this want of power ap-
peared upon the face of the company's charter, and that it
was therefore impossible for the company to do so; (4) that
the company would, nevertheless, perform this impossibility,
unless restrained by injunction.

6. The objection to the change of the time at which the
mortgage debt of the company should fall due, is frivolous.
It was pretended that the holders of preferred stock would be
able to pay the mortgage debt in instalments, whereas they
might not be able to pay it all at one time. Assuming
this to be so, yet the mortgage debt as it at present stands,
must all be paid between 1875 and 1888, whereas the consol-
idated mortgage provides for an extension of the time of pay-
ment to the year 1920. If the preferred stockholders are
prepared to raise all the mortgage debt in instalments before
1888, they can surely put that money out at interest, and be
abundantly prepared to pay it off in 1920.

7. Neither is there any force in the objection made to the
interest clause. In the first place, it is not averred by the
complaint that this interest clause is not contained in the prior
mortgages, nor that it is unusual, or in any way wrongful or
prejudicial to the preferred stockholders. In the second place,
it was affirmatively shown that such a clause was contained

in all the prior mortgages, and that in case of default in the payment of interest under any of these mortgages, they could be foreclosed and the railway could be sold. In the third place, such a clause is so invariably inserted in mortgages at the present day, that in a recent case, the English court of chancery, in a decree for specific performance of an agreement to give a mortgage, directed the mortgage to contain a clause making it fall due at once in case of default in payment of interest, *although the agreement was silent upon that subject* (*Seaton* agt. *Twyford, Law Rep.,* 11 *Eq.,* 591).

VI. The claim of the plaintiffs, considered simply as stockholders, to restrain the issue of bonds under this mortgage and to have the mortgage cancelled, is hardly capable of argument. Even as the complaint originally stood, no case was made out for the intervention of a court of equity, because the remedy of stockholders against the extravagance of directors, must be found inside the corporation, and they cannot ask for the intervention of a court of equity, unless they show a clear case of some act *ultra vires* on the part of the directors. But, as amended, the complaint does not contain a word of the charges of waste and fraud, upon which the plaintiff formerly relied. The only theory upon which the complaint can now be maintained on behalf of any class of stockholders, considered merely as stockholders, is, that a corporation, although expressly authorized by law to borrow money by the action of its directors, cannot take such action without the unanimous consent of its stockholders. This is too absurd for argument.

VII. The action is utterly without foundation, and has been brought in bad faith for sinister purposes. After having for six months spread before the court charges of the most scandalous description, the plaintiffs have by their amendment, on the eve of the trial, confessed their inability to prove one of them, and having obtained an injunction upon the strength of these accusations, they suddenly abandon all their

:case, except a few propositions of law which are self con-
tradictory, and which were obviously argued only for the
purpose of securing a few days more life to the injunction,
which, as plainly appears by the terms of the original com-
plaint, was itself obtained as a mere instrument of forcing a
settlement of other suits brought by these plaintiffs. The
complaint should be dismissed, with costs.

JAMES J.—This action is brought by the holders of pre-
ferred stock of the Erie Railway to restrain said company
from issuing &c., bonds secured by a mortgage made by it-
self to the Loan and Trust Company, in trust for that
purpose, to have said mortgage removed of record and can-
celled, and to restrain said Loan and Trust Company from
aiding in negotiating, &c., any of such bonds.

The first question arising is the power of the Erie Railway
Company to do the acts complained of.

The statute gives every railroad corporation the power to
borrow money for completing, furnishing, and operating its
road, to issue bonds for any amount so borrowed and to
mortgage its corporate property and franchise to secure such
bonds, or any debt contracted for the purposes afore-
mentioned (*Laws of* 1850, *Sub.* 10, *Sec.* 28, *Chap.* 240, 1
*R. S., Part* 1, *Chap.* 18, *Title* 3, § 1).

There was no proof in this case of the purpose for which
the bonds secured by this new mortgage were to be issued,
further than appeared on the face of said mortgage, viz :
"to consolidate its funded debt, obtain the money and
material necessity for perfecting its line of railway, enlarg-
ing its capacities and extending the facilities thereof."
Such purpose is within the scope of the powers given every
railroad corporation to create a debt and secure the pay-
ment thereof.

For aught that appears in the case, the funded debt and
other debts may have been incurred in constructing and

operating the road of said corporation, and the excess of money sought to be obtained by said bonds may be necessary further to complete and operate the same. In fact there was no proof before the court whereby it could say that the contemplated bonds and the mortgages affected the interests or rights of the preferred stock, or that it was an act not within the authority and power of such corporation.

If the power to make such mortgage and issue bonds thereon, existed in the corporation, no suit to restrain such action would lie by a common stockholder.

This was substantially conceded on the argument, and plaintiffs, as holders of certain shares of the "preferred stock," stand in no better condition.

Holders of "preferred stock," have no special control over the corporation or its management.

Stockholders are the constituent elements of a corporation, and in this case there is no other difference between the two classes than this; one is to be paid interest out of a certain fund, if raised, to the exclusion of the other, if such fund is inadequate to pay both.

The corporation is in no sense the trustee for the holders of preferred stock. Its duty is to each alike according to the conditions attached to the stock of each.

The grounds on which the plaintiffs place their case are not established. It is insisted, that consolidating the prior mortgage, and subsequent indebtedness into one large debt, would be detrimental, that the prior mortgages becoming due at separate intervals, and not all at once, was an advantage, that the interest clause in the new mortgage was dangerous and detrimental.

It may be that the directors of this corporation would be personally liable to those affected, should they divert or allow to be diverted, the net earnings first applicable to the preferred stock, before the interest on such stock was paid. But it is not necessary to decide that question.

What mortgage interest may be paid by the company, before payment of interest on its preferred stock, must depend on the construction to be given the conditions attached to such stock. Whatever rights attached to the preferred stock when issued, adhere to it still. If at the time of issue, only interest on *then* existing mortgages was to be paid before interest on preferred stock, subsequent mortgage indebtedness will not affect that stock, nor the legal right of its holders to payment of interest before payment of interest on mortgages given for such subsequent indebtedness; otherwise, however, if it should be held that interest on all mortgages of said corporation, whether for indebtedness prior or subsequent to the issue of said preferred stock, was first to be paid from its earnings.

It can therefore make no difference to the plaintiffs' rights whether the new mortgage consolidates the funded debts, or confuses or mixes prior with subsequent indebtedness.

Under one condition it would do no harm, under the other their rights would remain, and it behooves the managers of the corporation to see that those rights are not so confused as to be lost sight of.

The interest clause in the new mortgage, whereby, in case of default in the payment of interest, the whole principal of the bonds issued may become due in six months, is similar in substance to a clause contained in the previous mortgages, and hence the new mortgage affects no change in the rights of the holders of preferred stock.

My conclusions therefore are:

1st. That the railroad corporation had power to issue its bonds for the purpose expressed in the mortgage, and to mortgage its property and franchises, in trust to secure such bonds.

2d. That such an action as the present could not be maintained by the holder of the common stock of said corporation, and the facts do not place the plaintiffs, as holders of "preferred stock," in any better condition.

3*d*. That there is no evidence in the case showing that plaintiffs would sustain injury by the acts sought to be restrained.

The complaint should be dismissed, with costs to the defendant the Erie Railway Company, and without costs to the other defendant, the Farmers' Loan and Trust Company.